UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

MICHAEL LADNER,

        Plaintiff,

v.

MICHAEL J. ASTRUE,

        Defendant.

2:09-cv-00253-PMP-LRL

**MOTION FOR REVERSAL AND/OR REMAND (#20)**

**REPORT & RECOMMENDATION**

       Before the court is plaintiff's Motion for Reversal and/or Remand of the Administrative Law Judge's Decision/Administrative Determination (#20, filed July 10, 2009). Also before the court is defendant's Cross-Motion for Summary Judgment in Opposition to Plaintiff's Motion for Reversal of the Commissioner's Decision (#23, filed August 24, 2009), and plaintiff's Reply (#26, filed September 11, 2009).

**BACKGROUND**

       Plaintiff, Michael Ladner ("Ladner"), seeks judicial review of Administrative Law Judge ("ALJ") Michael B. Kennett's February 27, 2008 decision (AR 21-28), affirmed by the Appeals Council on December 8, 2009. (AR 10-14). Ladner alleges that he became disabled on January 15, 2005 due to psoriasis, sleep apnea, eczema, and allergies which lead to chronic fatigue. (AR 29-30, 248-52). Prior to that date, Ladner worked as a porter, janitor, laborer, and maintenance man. He left his work because his allergies were exacerbated by the dust and dirt associated with his work.

       On May 10, 2005, Ladner protectively filed an application for Social Security disability insurance benefits and an application for supplemental security income. *Id*. The claims were denied initially on August 12, 2005, and again upon reconsideration on January 19, 2007. (AR 41). On April

3, 2007, Ladner filed a written request for a hearing before an ALJ.[1]  (AR 21).  A hearing was held before the ALJ on January 3, 2008, in Las Vegas, Nevada, during which Ladner provided testimony regarding his physical and mental condition. (AR 292-311).  Ladner was represented at the hearing by an attorney, Robert J. Fleming.  (AR 21, 293-311).

On February 27, 2008, the ALJ concluded that Ladner was not disabled, as defined by the Social Security Act and Regulations, from January 15, 2005 through the date of his decision.  (AR 27).  The ALJ's decision became the final decision of the Commissioner of Social Security when the Appeals Council denied Ladner's request for review on December 9, 2008.  (AR 10-13).  Ladner commenced this action for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**Summary of Medical Evidence and Testimony**

On July 21, 2005, Ladner was seen at the Las Vegas Skin and Cancer Clinic.  (AR 160).  Although Ladner complained of a long history of itchy skin, with generalized burning since the age of 13, no reason for his skin condition was found.  *Id*.  Ladner further complained of nasal sinusitis allergies with nasal blockage such that he cannot breathe.  *Id.*  The examination revealed a healthy man with normal skin, no rash but alopecia totalis unrelated to his reported itching or disability claim.  *Id.*  The examining physician found no reason for Social Security disability on the basis of his skin.  *Id.*  Records from Woodson Dermatology, dated September 1, 2005, note Ladner's complaint of itching and burning skin and indicate a diagnosis of eczema, allergies, and allergic rhinitis.  (AR 167-168).

On August 9, 2005, Howard Coker, M.D., of the Diagnostic Center of Medicine, examined Ladner for complaints of "allergies, a rash on scalp, nose, nasal blockage."  (AR 172).  Ladner also complained of increased sweating (diaphoresis), difficulty concentrating, frequent recurring headaches, fatigue, and depression.  *Id.*  Dr. Coker ruled out nasal blockage and obstructive sleep apnea, but diagnosed chronic nasal obstruction; allergy/sinusitis; diaphoresis; and dermatitis.  *Id.*  Records from December 8, 2005, show that Ladner continued to complain of difficulty sleeping.  (AR 171).  The

---

[1] Although the request for hearing was filed untimely, *see* 20 C.F.R. 404.929 *et seq.* and 416.1429 *et seq.*, good cause was established for the late filing.

2

report noted that Ladner had had a sleep study "that suggested borderline sleep deficiency and borderline to mild obstructive sleep apnea. The recommendations were that the patient might benefit from an ENT evaluation, behavior therapy or the use of nasal CPAP.[2]" *Id.*

On September 29, 2005, a CT scan of Ladner's paranasal sinuses was performed at Mountain Diagnostics. (AR 170). The results indicated minimal mucosal thickening in the right mid ethmoid air cells, moderate mucosal thickening involving the left mid ethmoid air cells, and mild mucosal thickening and multiple mucous retention cysts versus polyps present in both maxillary sinuses. (AR 170, AR 240, AR 241). "Final Impressions" were noted as follows: 1) sinusitis involving the mid ethmoid air cells and the maxillary sinuses on both sides as described above; 2) 5 mm rightward deviation of the nasal septum. *Id.*

A polysomnogram (sleep study), was performed by Michael J. Labanowski at Nevada Sleep Diagnostics on October 24, 2005 through October 25, 2005. (AR 196-211). It was reported, "multiple awakenings led to reduction in the sleep efficiency. Only 3.5 hours of sleep were recorded." (AR 205). The findings indicated: "poor sleep efficiency at 47%" and "borderline to very mild obstructive sleep apnea." *Id.* Labanowski recommended, "due to the mild severity of his sleep apnea, multiple options for treatment may be considered. These would include ENT evaluation, dental appliance, behavioral therapy or use of nasal CPAP." *Id.* Labanowski continued, "The patient describes insomnia on his questionnaire. He may benefit from a regular sleep schedule as well as hypnotics or sedating antidepressants..." *Id.* Another sleep study occurred on December 15, 2005, which included use of a CPAP which was started at 5cm and increased up to 7cm. (AR 188). This was reportedly "very effective and lowered the AHI[3] to 1." *Id.* The report also indicated, "3.3 hours of sleep were identified." *Id.* Ladner's self-report on the "Morning Information" form indicated that he still felt "very tired and sleepy." (AR 186).

---

[2] Continuous Positive Airway Pressure machine. CPAP is used as therapy for obstructive sleep apnea.

[3] Apnea-Hypopnea Index. This refers to the number of episodes of reduced or absent respiratory effort per hour.

1         On December 13, 2006, Steven Gerson, D.O. performed an internal medicine examination of
2   Ladner. (AR 212-17). Dr. Gerson noted that Ladner presented with sleep apnea for which a CPAP
3   machine was recommended; but due to problems with insurance, one had not yet been received. (AR
4   212). Ladner reportedly complained of daily fatigue, intermittent dizziness, headaches at times, an
5   irregular sleep pattern, and low energy. *Id.* He stated that he neither napped nor suffered from
6   spontaneous sleeping. *Id.* Ladner reported pain is his shoulders and neck, which get weak and give out.
7   (AR 213). Ladner further indicated difficulty at times lifting, carrying, pushing and pulling. *Id.* Dr.
8   Gerson noted a past medical history of sleep apnea, eczema, allergies, nasal polyp, and nose surgery in
9   childhood. *Id.*

10         The physical examination showed midline lumbar spine tenderness and paralumbar muscle
11   tenderness. (AR 214). The neurologic examination showed decreased sensation to pinprick in the
12   stocking glove distribution to both lower extremities. *Id.* The skin examination revealed "minimal
13   white flaky dermatitis present on both forearm, with minimal pruritus, negative pain, negative erythema,
14   and negative tenderness." *Id.* In all other respects, the examination results in the normal range. Dr.
15   Gerson noted no difficulty for Ladner to get on and off the examination table, and mild difficulty to
16   walk, walk on toes and heels, and to squat and rise. (AR 215). Dr. Gerson opined that Ladner
17   occasionally could carry twenty (20) pounds and frequently carry ten (10) pounds. *Id.* He further stated
18   that Ladner could stand, walk, or sit for six (6) hours in an eight (8) hour workday and that standard
19   breaks and lunch periods would provide sufficient relief to allow for eight hours of work. (AR 215-16).
20   In Dr. Gerson's opinion, Ladner could frequently climb ramps/stairs, stoop/bend, kneel, and
21   crouch/squat; he could occasionally climb ladders/scaffolds and crawl. (AR 216). Dr. Gerson did not
22   suggest any physical limitations but did suggest three environmental restrictions due to Ladner's history
23   of sinus problems and sleep apnea: 1) temperature extremes; 2) chemicals; and 3) dust. (AR 217).

24         On January 3, 2007, Ladner was set up with a CPAP machine. (AR 233). In a February 13,
25   2007, one month follow-up survey, Ladner indicated that since starting use of the device, he was no
26   longer snoring and experienced less fatigue than before using the setup, though he had irritated eyes and

4

1  a runny nose. (AR 232). He further reported 6-8 hours of sleep on average and wished to continue
2  using the machine. *Id.* On an April 19, 2007, three month follow-up survey, Ladner reported that he
3  was doing well and sleeping seven hours on average, without snoring, and experiencing less fatigue.
4  (AR 229). He again reported irritated eyes and a runny nose. *Id.* A six month survey, dated June 27,
5  2007, indicated that Ladner still experienced less fatigue than before starting the CPAP, slept without
6  snoring, and no longer reported irritated eyes or runny nose. (AR 228). Ladner also reported that he
7  again was sleeping two to three hours on average. *Id.*

8  On January 7, 2007, Mayenne Karelitz, M.D., performed a Physical Residual Functional
9  Capacity Assessment on Ladner. (AR 220-27). Dr. Karelitz reported that Ladner could occasionally
10 lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk or
11 sit six (6) hours in an eight (8) hour workday. (AR 221). Dr. Karelitz noted postural limitations of
12 occasional crawling and climbing (AR 222), as well as environmental limitations such as avoiding
13 exposure to extreme cold, extreme heat, and fumes, odors, dusts, gases, and poor ventilation due to
14 Ladner's sleep apnea and sinus problems. (AR 224). Dr. Karelitz noted that while Ladner had some
15 limited range of motion in his back, his neurological examination was withing normal limits. (AR 227).
16 She gave Ladner a "light functional" capacity rating. *Id.*

17 A psycho-educational evaluation was conducted by Lowell F. Masters, Ed.D., on August 31,
18 2005. (AR 161-166). Masters noted that Ladner graduated high school with a regular high school
19 diploma, though he received special education services for all academic learning problems beginning
20 in the second grade. (AR 161). The Reynolds Intellectual Assessment scale ("RIAS") was performed
21 to determine Ladner's cognitive abilities. Ladner's scores on the RIAS were as follows: verbal index
22 score, 78; nonverbal index score, 88; composite index score, 81; and cumulative memory index score,
23 94. (AR 162). These scores placed Ladner in the borderline range for verbal index and the low-average
24 range for nonverbal, "less language loaded skills." *Id.* The cumulative memory test score placed
25 Ladner in the average range. *Id.* Dr. Masters diagnosed Ladner with reading and mathematical
26 disorders and a disorder of written expression. (AR 165). He further noted that Ladner had no

restrictions on his fine and gross motor skills (AR 162). He also stated that while Ladner does not have Attention Deficit Disorder, he does exhibit "focus and concentration difficulties that would affect his performance negatively much as if he had Attention Deficit Disorder of the inattention type." (AR 164). Dr. Masters opined that Ladner's allergies and sinus problems impact his ability to concentrate and to feel a satisfactory degree of stamina. (AR 165). He also noted, while Ladner's stated desire to earn a Microsoft certification was not an impossibility, his reading and writing skills pose a challenge. (AR 165). Ladner has been declined assistance in computer training by the State of Nevada Vocational Rehabilitation due his reading, writing, and mathematical limitations. (AR 154; AR 308).

At the January 3, 2008 hearing, Ladner testified that he is supposed to use the CPAP machine for ten hours per day. (AR 304). He testified that despite use of the CPAP machine, he was sleeping two hours per night. (AR 299). In response to the ALJ's question, Ladner stated that he had no side effects from his medications. (AR 298). As to which medical problems interfere with his ability to work, Ladner said, "Sleep Apnea is #1. I have allergies. . . . So it's both environment and there's food I'm allergic to." (AR 298). Ladner testified that he's had allergies since he was a child. (AR 309). As to what in the environment sets off his allergies, Ladner stated, "Trees, oh, yeah. Trees, grass, food, dust. You name it. I'm allergic to everything out there pretty much." (AR 298-99). In response to his attorney's question, Ladner agreed that his allergies get worse with the change of seasons. (AR 308-09). The ALJ asked what other medical conditions interfered with Ladner's ability to work, to which Ladner replied eczema and a runny nose, which causes post nasal drip. (AR 299). Ladner also testified that he sometimes nods off during the day while watching television, but he cannot nap. (AR 306). He also gets dizzy at times, (AR 306-07), sometimes has difficulty walking in a straight line when he is not rested, (AR 307), and has fallen asleep at work (AR 306). Ladner further testified to getting headaches four to five times a week which "last until I take something for it or, you know, until – or until I get up. Sometimes I get up and move around." (AR 309).

Ladner testified that, at most, he could stand for two hours at a time. (AR 302). When asked what bothered him when standing on his feet, Ladner stated, "The fatigue from my Sleep Apnea due

6

to my allergies and lack of oxygen getting to my blood." *Id.* When asked how long he could sit at a time, Ladner replied, "Not very long." *Id.* He explained, "It depends on what I'm doing or where I'm at or the environment, or what's going on at the time." *Id.* "[W]ith Sleep Apnea what I got, I got to get up and move." (AR 302-03). Ladner testified that he could probably pick up fifty pounds, but not the whole day. (AR 303). He explained, "if I'm having Sleep Apnea so long and I sleep the wrong way, you know – if I keep doing the same thing like that I have this hurt in my neck, which is not bad. It'll just start up." (AR 303-04).

## DISCUSSION

### A. Standard of Review

When deciding a Social Security appeal, the decision of the Commissioner must be affirmed if it is supported by substantial evidence and the Commissioner applied the correct legal standards. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004) (citation omitted). When reviewing factual determinations by the Commissioner, acting through the ALJ, the court affirms if substantial evidence supports the determinations. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003) (citation omitted). "Substantial evidence is more than a mere scintilla, but less than a preponderance . . . ." *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1011 (9th Cir. 2003) (citation omitted). It is relevant evidence which a reasonable person might accept as adequate to support a conclusion when the entire record is considered. *Id.* (citation omitted). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson*, 359 F.3d at 1196 (citation omitted). The ALJ's determinations of law are reviewed de novo, although deference is owed to a reasonable construction of the applicable statutes. *McNatt v. Apfel*, 201 F.3d 1084, 1087 (9th Cir. 2000) (citation omitted).

### B. The Five Step Sequential Evaluation

Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001); *see* 20 C.F.R. § 404.1520(a)-(f). If a claimant is found to be disabled, or not disabled, at any point during the process, then no further

7

assessment is necessary. 20 C.F.R. § 404.1520(a). At step one, the Secretary determines whether a claimant is currently engaged in substantial gainful activity. *Id.* § 416.920(b). If so, the claimant is not considered disabled. *Id*. § 404.1520(b). At step two, the Secretary determines whether the claimant's impairment is severe. *Id.* § 416.920(c). If the impairment is not severe, the claimant is not considered disabled. *Id*. § 404.152(c). At step three, the claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1. The claimant will be found disabled if the claimant's impairment or combination of impairments meets or equals a listed impairment. *Id*. § 404.1520(d). If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant can perform past relevant work. *Id*. § 416.920(e). If the claimant can engage in past relevant work, then no disability exists. *Id*. § 404.1520(e). If the claimant cannot perform past relevant work, the Secretary has the burden to prove the fifth and final step by demonstrating that the claimant is able to perform other kinds of work. *Id*. § 404.1520(f).

Claimants have the burden of proof at steps one through four, subject to the presumption that Social Security hearings are non-adversarial, and the Commissioner's affirmative duty to assist claimants in fully developing the record even if they are represented by counsel. *Tackett v. Apfel*, 180 F.3d 1094, 1098 and n.3 (9th Cir. 1999); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). If this burden is met, a prima facie case of disability is made, and the burden shifts to the Commissioner (at step five) to prove that, considering residual functional capacity ("RFC"),[4] age, education, and work experience, a claimant can perform other work which is available in significant numbers. *Tackett*, 180 F.3d at 1098, 1100; 20 C.F.R. § 404.1520, § 416.920. If the Secretary cannot meet his or her burden, the claimant is entitled to disability benefits. *Id*. § 404.1520(a).

. . .

---

[4] Residual functional capacity measures what a claimant can still do despite existing "exertional" (strength-related) and "nonexertional" limitations. *Cooper v. Sullivan*, 880 F.2d 1152, 1155 n.s. 5-6 (9th Cir. 1989). Nonexertional limitations limit ability to work without directly limiting strength, and include mental, sensory, postural, manipulative, and environmental limitations. *Penny v. Sullivan*, 2 F.3d 953, 958 (9th Cir. 1993); *Cooper,* 880 F.2d at 1155 n.7; 20 C.F.R. § 404.1569a(c).

**C. The ALJ's Findings**

The ALJ found, and the parties do not dispute, that Ladner passed the hurdles set at steps one and two of the five-step process, inasmuch as Ladner was not engaged in substantial gainful activity, and he suffered from a severe impairment, asthma.[5] At step three, the ALJ found that Ladner does not have an impairment that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpart P, App. 1. In so finding, the ALJ stated that Ladner's "impairment of asthma, although severe does not prevent him from working and performing activities of daily living." (AR 25). Turning to the fourth inquiry, the ALJ found, "The evidence demonstrates the claimant has the ability to perform light work without difficulty," *id.*, but that Ladner was not able to perform any past relevant work as a janitor and casual laborer because of his asthma and breathing problems. (AR 27). The ALJ thus assessed Ladner's RFC.

In determining Ladner's RFC, the ALJ first noted that Ladner stopped working because of allergies and testified that "his medical problems that interfere with his ability to work are sleep apnea, allergies, eczema, and post-nasal drip." (AR 26). With regard to Ladner's complaints about eczema, the ALJ noted "[t]he examiner at Las Vegas Skin and Cancer clinic found no reason for disability based on the claimant's skin condition; in fact he found no evidence of the claimant's alleged rash." (AR 26, 160). The ALJ also set forth that Ladner "testified that he was capable of standing and walking at one time, 1 to 2 hours and did not specify the time he could sit without difficulty" and that "he could lift and carry 50 pounds." *Id.*

As to Ladner's sleep apnea and fatigue, the ALJ acknowledged Ladner's testimony that "he was supposed to use the CPAP machine for 10 hours a day. He testified to falling asleep at work a couple times and that he gets confused due to sleep apnea." *Id.* While the ALJ acknowledged that Ladner "testified to using a CPAP machine, but that it was not fully effective," he found the testimony "in

---

[5]Ladner notes that he has not been diagnosed with asthma. Rather he suffers from allergies, chronic sleep apnea, eczema, and psoriasis. Brief (#20) at 31.

9

conflict with the medical records at exhibits 8F and 12F."[6] *Id.* In rejecting Ladner's claim that the CPAP machine was not effective, the ALJ referred to the follow-up records from Dr. Labanowski which "documented improvement in the claimant's breathing and sleeping condition after he started using the CPAP machine. The claimant stated he was less fatigued and was sleeping seven hours per night with no snoring." (AR 26, 235).

The ALJ gave "significant weight" to the findings and opinion of Dr. Gerson, "in which he found claimant capable of performing light exertional work with asthma-type restrictions." (AR 26, 215-17). The ALJ further noted that Dr. Masters's evaluation "found the claimant's cognitive abilities only mildly limited." (AR 26). In assigning "less than significant weight Dr. Masters's opinion that "claimant had health problems that impacted his ability to concentrate and because of fatigue," the ALJ explained that he found this opinion "was not consistent with the record as a whole. The record as a whole did not evidence that claimant had an impairment that would significantly limit his ability to work." (AR 26-27). The ALJ concluded that Ladner had an RFC to perform the full range of light work with asthma type restrictions and sedentary work with asthma like restrictions. (AR 26).

Ladner argues that the ALJ's decision should be reversed on the following grounds: 1) the ALJ improperly discounted Ladner's testimony regarding his symptom of fatigue and poor sleep efficiency; 2) the determination that Ladner had the RFC to do light work was not based on substantial evidence insofar as the ALJ failed to give weight to medical records noting Ladner's lethargy and fatigue and his poor sleep efficiency; and 3) the ALJ improperly discounted the treating physician's findings. Mot. (#20) at *passim.*[7]

**D. Credibility Determination**

Ladner contends that substantial evidence does not support the ALJ's decision, because the ALJ

---

[6] Exhibit 8F is the series of reports from Nevada Sleep Diagnostics and signed by Dr. Labanowski. (AR 186-211). Exhibit 12F is the series of reports related to Ladner's use of the CPAP machine. (AR 228-242).

[7] Ladner includes as part of his Opening Brief (#20) his "Claimant's Memorandum in Support of Request for Reversal of ALJ's Decision," which was prepared by Fleming for Ladner's appeal to the Appeal's Council. This portion of the Brief (#20), contains the most well-defined legal arguments, while the remainder of the Mot. (#20) asserts facts pertinent to Ladner's physical condition in support of his claim for disability.

improperly rejected his testimony as to the severity of his chronic fatigue and lack of sleep. *See* Opening Brief (#20) at 9-10. For example, while the ALJ referred to reports indicating improved sleep with the CPAP machine, it is argued that he improperly failed to note a later report which indicated that Ladner had returned to sleeping only 2-3 hours per night. *Id.* at 12. Similarly, Ladner maintains that the ALJ erred in not considering records from Nevada Sleep Diagnostics which consistently indicated sleep efficiency at 47%, with no improvement. *Id.* at 11. Defendant maintains that the ALJ properly discredited Ladner's testimony regarding his subjective symptoms of fatigue and lack of sleep, because he "noted that despite plaintiff's allegations of disabling sleep apnea, the medical evidence showed that the condition was quite effectively treated with a CPAP machine." Opp'n (#23) at 7.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). To determine whether a claimant's testimony regarding subjective symptoms is credible, an ALJ must engage in a two step analysis. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc). It is not necessary that a claimant show "that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282. The ALJ may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence, which fully corroborates the symptoms. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

If the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Smolen*, 80 F.3d at 1281); *see also Reddick*, 157 F.3d at 722 ("[U]nless there is affirmative evidence showing that the claimant in malingering, the Commissioner's reasons for rejecting claimant's

testimony must be clear and convincing."). In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

Ladner has consistently complained of fatigue, concentration difficulties, and lack of sleep. *See e.g.* (AR 171-72; AR 205; AR 212; AR 228). He has been diagnosed with sleep apnea (AR 171, 213), a medical condition that could reasonably be expected to produce the alleged symptoms—poor sleep efficiency and concomitantly fatigue and concentration difficulties. He thus clears the first hurdle of the test. While the ALJ noted Ladner's testimony regarding the severity of his symptoms—that he was sleeping only two hours per night on the CPAP machine; his inability to stand or walk more than one to two hours at a time due to fatigue; that he has fallen asleep at work; and that he gets confused due to sleep apnea—he did not provide specific, clear and convincing reasons for not crediting Ladner's testimony regarding his symptoms.

In rejecting Ladner's claim that he was getting only two hours of sleep per night while using the CPAP machine, the ALJ stated only that the testimony was "in conflict with the medical records at exhibits 8F and 12F."[8] (AR 26). The ALJ, however, did not specify what within those records is "in conflict" with Ladner's testimony. The ALJ later stated, "[t]he follow-up records from Dr. Labanowski at exhibit 12F[9] documented improvement in the claimant's breathing and sleeping condition after he started using the CPAP machine. The claimant stated he was less fatigued and was sleeping seven

---

[8] Exhibit 8F is the series of reports from Nevada Sleep Diagnostics and signed by Dr. Labonowski. (AR 186-211). Exhibit 12F is the series of reports related to Ladner's use of the CPAP machine and signed by Dr. Boyer. (AR 228-242).

[9] Exhibit 12F are reports from Dr. Boyers.

12

hours per night with no snoring." (AR 26).[10] Nevertheless, the ALJ ignored other records in the exhibit, including the latest follow-up report from Dr. Boyer, in which Ladner reported sleeping only two hours per night on the CPAP machine (AR 228); which is consistent with his testimony at the hearing and his sleep pattern before he began using the CPAP machine, s*ee* (AR 205) ("multiple awakenings led to reduction in the sleep efficiency.  Only 3.5 hours of sleep were recorded."), and even with use of the CPAP machine. *See* (AR 188) (reporting the CPAP to be "very effective and lowered the AHI to 1," but indicating "3.3 hours of sleep were identified."). Similarly, the ALJ referred to "exhibit 8F" to support his rejection of Ladner's testimony but did not state what, specifically, in the twenty-six page exhibit is in conflict with the testimony.

In any event, a claimant's testimony as to the *severity* of symptoms may not be discredited merely because they are unsupported by objective medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  Rather, "unless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins*, 466 F.3d at 883.  No finding of malingering was made, nor any specific finding as to Ladner's statements regarding his lack of sleep, chronic fatigue and concentration difficulties.  The court thus finds that the ALJ erred when he failed to provide clear and convincing reasons for not crediting Ladner's subjective claims of sleeplessness, severe fatigue and concentration difficulties.

**E. Rejection of Medical Opinion**

Ladner asserts that the ALJ improperly discounted Dr. Masters's opinion that Ladner suffers "focus and concentration difficulties that would affect his performance negatively much as if he had Attention Deficit Disorder of the inattention type," and that " Ladner's allergies and sinus problems impact his ability to concentrate and to feel a satisfactory degree of stamina." (AR 164, 165).  As an initial matter, the court disagrees with Ladner's contention that Dr. Masters is a treating physician.  A

---

[10]Though the ALJ did not specify which page or report from exhibit 12F he is referring to, this information appears to be from the 3 Month follow-up report.  (AR 229).

treating physician is a physician who has been employed to cure and can provide a longitudinal picture of a patient's impairments. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Smole*n, 80 F.3d at 1285. In contrast, an examining physician is one who has examined the patient on one occasion for the purpose of evaluating his disability claim. 20 C.F.R. §§ 404.1527(d)(1); 416.927(d)(1). There is no indication that plaintiff saw Dr. Masters other than on one occasion, from which Dr. Masters generated his report.

Here, the ALJ gave "less than significant weight to the opinion of Dr. Maters [Sic.] . . . in which he opined the claimant had health problems that impacted his ability to concentrate and because of fatigue," stating only that he found that portion of his opinion "was not consistent with the record as a whole. The record as a whole did not evidence that claimant had an impairment that would significantly limit his ability to work."[11] (AR 26-27). However, the ALJ did not identify what specific evidence in the record contradicted Dr. Masters's opinion. Inasmuch as "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record," *see Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995) (citing *Andrews v. Shalala*, 53 F. 2d at 1456), the ALJ's rejection of Dr. Masters's opinion was also in error.

**F. Remand for Further Proceedings**

Whether to remand for further administrative proceedings is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1175-1178 (9th Cir. 2000). Remand is appropriate if enhancement of the record would be useful. *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citing *Harman*, 211 F.3d at 1178). Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. *Benecke*, 379 F.3d at 593. Here, even if the court accepted as true Ladner's testimony regarding the severity of his fatigue, sleeplessness, and concentration difficulties,

---

[11] Notably, the ALJ assigned less than significant weight to only this portion of Dr. Masters's opinion, which corroborates Ladner's symptom testimony, but relied on other portions of his evaluation regarding Ladner's cognitive abilities (only mildly limited) and his fine and gross motor abilities (no restrictions). *See* (AR 26).

14

it is not clear that he is entitled to disability benefits. First, his testimony does not establish what specific functional limitations would necessarily preclude him from work in the national economy. Second, when a claimant's nonexertional impairments may significantly limit the range of work that might otherwise be permitted by his exertional limitations, a vocational expert is necessary to determine the range of work that the claimant can perform. *See Hoopai v. Astrue*, 499 F.3d 1071, 107-76 (9th Cir. 2007); *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tackett*, 180 F.3d at 1101. Ladner suffers almost solely from nonexertional impairments, but no vocational expert testimony was introduced. Remand for further administrative proceedings is therefore appropriate in this case.

Where an ALJ improperly rejects a claimant's testimony regarding his limitations, and the claimant would be determined to be disabled if his testimony were credited, the testimony must be credited as a matter of law. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995); *Varney v. Secretary of Health and Human Services* (*Varney II*), 859 F.2d 1396, 1398-99, 1401 (9th Cir. 1988). Though not mandatory, the credit-as-true rule has likewise been applied to cases where as here, even accepting the claimant's symptom testimony as true, remand is necessary to determine disability. *See Vasquez v. Astrue*, 547 F.3d 1101, 1106-07 (9th Cir. 2008) (declining to adopt a general credit-as-true rule, but instructing the ALJ to accept the claimant's symptom testimony as true in determining whether she was entitled to benefits on remand, noting age of claimant, 58, and age of her claim, six years); *Hammock v. Bowen*, 879 F.2d 498, 504 (9th Cir. 1989) (instructing ALJ to credit-as-true plaintiff's pain testimony on remand where plaintiff was of advanced age and had already experienced severe delay in her application). Among other things, the credit-as-true rule operates to prevent unnecessary duplication in the administrative process. *Vasquez*, 547 F.3d at 1107 (citing *Varney II*, 859 F.2d at 1398).

In the interest of moving this nearly six year old claim forward, *see Vasquez*, 547 F.3d at 1107; *Hammock*, 879 F.2d at 503, and recognizing that "the purpose of the credit-as-true rule is to discourage ALJs from reaching a conclusion about a claimant's status first, and then attempting to justify it by ignoring any evidence in the record that suggests an opposite result," *Vasquez*, 547 F.3d at 1107 (citing *Varney II*, 859 F.2d at 1398), the ALJ should be directed to accept as true Ladner's symptom testimony

in making the disability determination on remand. The ALJ likewise should be directed to accept as true the opinions of Dr. Masters with regard to Ladner's symptoms. *Lester*, 81 F.3d at 834 ("Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law.") (internal quotations and citations omitted). Further, testimony from a vocational expert should be required to determine what work in the national economy, if any, Ladner can perform in light of his sleeplessness, fatigue and concentration difficulties, in combination with the severe impairment of asthma as identified by the ALJ.

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that plaintiff's Motion for Reversal and/or to Remand (#20) be granted to the extent that the decision of the Commissioner be REVERSED and this action REMANDED for further proceedings as discussed above. It is further recommended that defendant's Cross-Motion to Affirm (#23) be denied.

DATED this 30th day of June, 2010.

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**